IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| DONALD BRINKLEY, | ) Civil Action No. 3:08-3427-GRA-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning

the disposition of Social Security cases in this District. Plaintiff, Donald Brinkley, brought this action

under 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the

Commissioner of Social Security (Commissioner) denying his claim for Disability Insurance Benefits

(DIB) and Supplemental Security Income (SSI).

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his first applications for DIB and SSI in August 1997, alleging disability

beginning February 1, 1997. These claims were denied at the initial level in October 1997, with no

appeal by Plaintiff. Plaintiff filed his second applications for DIB and SSI on January 9, 2004,

alleging disability as of September 13, 2002. These claims were denied initially and on

reconsideration. A hearing was held before an ALJ on December 13, 2005, and the ALJ denied

Plaintiff's applications in a decision dated March 10, 2006. On March 15, 2006, Plaintiff requested

review of the decision by the Appeals Council. On the same date, he filed his third claims for DIB

and SSI, alleging disability as of September 13, 2002. These claims were denied initially on May 31,

2006, on reconsideration August 11, 2006, and Plaintiff filed a timely request for an ALJ hearing on October 19, 2006.

By order of the Appeals Council dated February 21, 2007, Plaintiff's previous claims were remanded for further proceedings. The same order directed the ALJ to associate the claim files and issue a new decision on the associated claims. A hearing was held on June 20, 2007, at which Plaintiff (represented by counsel) appeared and testified. A vocational expert ("VE") also testified at the hearing. The ALJ issued a decision dated September 21, 2007, denying benefits and concluding that work exists in the national economy which Plaintiff can perform. The Appeals Council denied Plaintiff's request for review on August 8, 2008 (Tr. 9-11), making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Plaintiff filed this action on October 8, 2008.

## FACTUAL BACKGROUND

Plaintiff was thirty-nine years old at the time he alleged he became disabled and forty-four years old at the time of the ALJ's decision. He attended school through the eighth grade and later obtained a GED. Plaintiff has past relevant work experience as an electrician, pipe fitter, millwright, iron worker, mobile home set-up laborer, backhoe operator, and welder. Plaintiff alleges disability due to degenerative joint disease; impairments to his right shoulder, ankle, and knee; obesity; depression; personality disorder; left eye blindness; chronic obstructive pulmonary disease ("COPD"); and gastroesophageal reflux disease ("GERD").

## ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law (Tr. 21-32):

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.	The claimant has not engaged in substantial gainful activity since September 13, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.	The claimant has the following severe impairments: degenerative joint disease, obesity, depression, personality disorder, left eye blindness and gastroesophageal reflux disease (20 CFR 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled sedentary work with occasional lifting and carrying over 10 pounds, frequently lifting and carrying 1-2 pounds, no standing and/or walking over 2 hours in an 8-hour day, in low stress environment, with no interaction with the public or co-workers, no repetitive fine dexterity or gripping with the hands, no binocular vision or depth perception, no balancing or climbing, avoidance of hazards such as unprotected heights, vibration, and dangerous machinery, and in environment free from poor ventilation, dust, fumes, gases, odors, and extremes of humidity and temperature.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.	The claimant was born on June 12, 1963, and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P. Appendix 2).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 13, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## STANDARD OF REVIEW

The only issues before the Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. <u>Richardson v.Perales</u>, 402 U.S. 389 (1971) and <u>Blalock v. Richardson</u>, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a), 416.905(a), <u>see</u> <u>Blalock</u>, 483 F.2d at 775.

## MEDICAL EVIDENCE BEFORE THE ALJ

On December 29, 2003, Plaintiff was admitted to Lenoir Memorial Hospital to rule out myocardial infarction after being treated in the emergency room for chest pain. Dr. Joseph Saracino ordered a CT of Plaintiff's chest and an upper GI endoscopy. Plaintiff's December 31, 2003 discharge diagnoses were chest pain secondary to esophagitis, acute gastritis, acute duodenitis, and a hiatal hernia. Cardiac ischemia was ruled out. (Tr. 359-365).

On January 5, 2004, Dr. Steven R. Bialkin, of Eastern Nephrology Associates, performed a consultative examination. Plaintiff reported chronic pain in his shoulder and back, chest pain, work-related injuries, and a "general debilitated state." Dr. Bialkin wrote that Plaintiff's cardiac workup was negative and his chest pain was related to gastrointestinal pain. He advised Plaintiff to stop smoking and noted he could not partake in Plaintiff's issue surrounding disability. Plaintiff was

referred to Dr. Saracino for further evaluation. (Tr. 282-283). On January 7, 2004, Dr. Saracino noted that Plaintiff was in no acute distress; his lungs were clear without rales, rhonchi, or wheezes; he had normal motor reflexes and gait; and he had a normal mood and affect. Dr. Saracino wrote that Plaintiff had been affected by the recent death of his mother, which probably had an effect on his symptoms. (Tr. 284-285).

On January 29, 2004, Plaintiff was examined by Zia Virk, M.D. of Kinston Medical Specialists. Plaintiff complained of discomfort in his right shoulder, knee, and ankle (which he attributed to a prior motor vehicle accident) and related a history of anxiety and depression. Upon examination, Dr. Virk noted that Plaintiff had a "fair range of motion in both shoulders," but with a "slight" reduction in active movements and crepitation (crackling or rattling noise). Straight leg raising tests were negative for back pain. Dr. Virk also noted that Plaintiff was legally blind in his left eye and had a rash on his face and back. She referred him to a dermatologist and a psychiatrist. Dr. Virk advised Plaintiff that she did "not do disability especially with the legal documentation from any attorneys or any chronic pain management" and noted that she would only "give him medical care for his symptoms." She recommended Tylenol for Plaintiff's alleged chronic pain and emphasized diet, weight reduction, and cessation of smoking. (Tr. 286-287).

On February 4, 2004, Dr. Gregory Gridley, a psychologist, noted that Plaintiff had features of post-traumatic stress disorder ("PTSD") with concomitant features of depression and panic disorder. Dr. Gridley opined that Plaintiff was "disabled from work, not so much from the physical standpoint . . . but certainly from a psychological standpoint with this pretty substantial depression and apparent chronic pain." (Tr. 289).

During mid-February 2004, Plaintiff was treated at Lenoir Memorial Hospital Emergency for right shoulder pain, which was thought to be arthritic in nature. Anxiety medication was prescribed. (Tr. 335-38). On February 23, 2004, Plaintiff presented to Dr. Virk with complaints of anxiety and chronic right shoulder pain. Dr. Virk noted that Plaintiff had a decreased range of motion in his right shoulder. She prescribed Toradol (a nonsteroidal anti-inflammatory) and Effexor (an antidepressant). Dr. Virk subsequently switched Plaintiff's antidepressant medication to Zoloft, but declined Plaintiff's request that she write a note stating that he was unable to work. (Tr. 308).

During March 2004, Plaintiff presented to Christopher M. Barsanti, M.D. of Orthopaedics East, Inc. for the first time since 1999 (when Dr. Barsanti treated him for a right shoulder rotator cuff tear following a motorcycle accident). Dr. Barsanti noted that Plaintiff had good passive range of motion, neurological exam was grossly intact and, although he had a bit of atrophy over his deltoid muscle, physically he seemed grossly intact. An MRI of Plaintiff's shoulder, taken on April 3, 2004, revealed that there were some changes to the rotator cuff, but it was not torn. In addition, there was a small perilabral cyst and a posterolateral humeral head defect compatible with prior anterior dislocation, with extensive fibrosystic erosive changes involving the humeral head. (Tr. 311-312). Plaintiff returned to Dr. Barsanti on April 26, 2004, stating that he was unable to work due to his right shoulder and he wanted to be on disability. Dr. Barsanti recommended anti-inflammatory medication and physical therapy, as nothing in the shoulder needed surgical intervention, and advised that from just a shoulder standpoint he could not find Plaintiff totally disabled. Plaintiff stated he was unable to afford any medications. Dr. Barsanti's notes indicate that Plaintiff was quite unhappy and threatening while in the office. (Tr. 310).

On April 1, 2004, Plaintiff presented to Mouhamed Fakhri, M.D., of Family Medicine & Rehabilitation Center, for a consultative examination. Plaintiff reported pain in his right shoulder, which occurred during cold weather or when he lifted objects or moved his right arm. He also complained of pain in his right knee which occurred after prolonged standing or walking or using stairs. Plaintiff reported he took Tylenol for his shoulder and knee pain, stating that it "helped some." He also reported pain in his right ankle after prolonged standing or walking. Dr. Fakhri noted that Plaintiff did not need help getting on or off the examination table, was able to get up on his own, could squat and rise, and could walk on his heels and toes with some difficulty. He did not observe any muscle atrophy, and noted that Plaintiff had full 5/5 muscle strength in his extremities and strong grips. Plaintiff also had full range of motion in all of his joints, including his spine, although he reported pain with movement of his shoulder. Dr. Fakhri concluded that plaintiff probably had arthritis of the right shoulder from overuse. Plaintiff reported pain when Dr. Fakhri pressed his patella (kneecap) against his femur. Dr. Fakhri's impression was patellofemoral syndrome secondary to osteoarthritis. Dr. Fakhri observed that Plaintiff had a full range of motion in his right ankle with no tender points, although Plaintiff reported pain when his ankle moved up and down. Dr. Fakhri's impression was tibiotalar joint arthritis and depression. (Tr. 294-296). X-rays indicated no abnormalities in Plaintiff's knees or shoulders. (Tr. 290).

Plaintiff returned to Dr. Virk in late April 2004. He continued to complain of anxiety, but stated that the Zoloft helped him. Dr. Virk noted that Plaintiff's lungs were clear and he had a decreased range of motion in his right knee and shoulder. (Tr. 307).

On April 26, 2004, Plaintiff presented for evaluation at Eastpointe (part of the North Carolina Division of Mental Health). (Tr. 367-381). He received individual therapy at Eastpointe through

February 2005. (Tr. 386-97, 490-512). Plaintiff was diagnosed with PTSD, past alcohol abuse, and adult antisocial disorder. (Tr. 369). During the course of treatment, Robert Spence, M.S., L.C.A.S., noted that he did not observe any symptoms of PTSD, Plaintiff spent an entire hour discussing his disability claims, and Plaintiff had yet to discuss significant symptoms or problems. Mr. Spence opined that Plaintiff was "angling for disability." (Tr. 496-497).

On July 13, 2004, Plaintiff stopped by the offices of the North Carolina Vocational Rehabilitation Services, to discuss his employment prognosis and request a letter regarding his inability to return to work. Rehabilitation counselor E. Parker Stokes, M.A., Ed., wrote a letter based on information that Plaintiff provided during his visit, "with the assumption that there is supporting medical data to substantiate his impairments." The impairments allegedly included sleep apnea, which the rehabilitation counselor noted could lead to lethargy and fatigue, "which can be dangerous on the job or driving." Mr. Stokes opined that he knew of no jobs that Plaintiff could perform without jeopardizing himself or his employer. (Tr. 192-193, 433-444). Also in July 2004, Plaintiff complained about right knee and shoulder pain to Dr. Charles Classen of the Kinston Orthopaedic & Sports Medicine Center. Dr. Classen's impression was a recurrent dislocation of the right patella and a probable torn right rotator cuff. He discussed surgery with Plaintiff. Dr. Classen noted that Plaintiff was in the process of applying for Medicaid and would return once he had medical benefits. (Tr. 539).

Plaintiff sought treatment for his right shoulder and knee at the Kinston Community Health Center (KCHC) between May 2004 and February 2006. (Tr. 416-425, 531-534). In October 2004, Rashad Sheikh, M.D., of KCHC observed that Plaintiff's COPD was "fairly controlled." (Tr. 421). On November 4, 2004, Plaintiff underwent an examination in order to detect any health effects of his

work at the Savannah River Site ("SRS") during 1995 and 1996. (Tr. 442, 487-489). Plaintiff's physical exam revealed joint pain in his right knee and shoulder, normal breathing test results, and normal chest x-rays. Plaintiff had multiple areas of plaque and scaling skin. A hearing test revealed mild, high frequency hearing loss typically caused by exposure to noise. Other than an elevated cholesterol level, Plaintiff's blood work (including kidney and liver functioning tests) was noted as being within normal limits. There was no indication that Plaintiff's skin condition resulted from exposure to radiation at the SRS. (Tr. 487-488).

During January 2005, Dr. Sheikh completed a residual functional capacity ("RFC") report regarding Plaintiff. Dr. Sheikh's primary diagnosis was severe degenerative arthritis of Plaintiff's right knee and left eye blindness, with secondary diagnoses of GERD, history of hiatal hernia, and history of PTSD. Dr. Sheikh noted that Plaintiff experienced crepitation (a rattling or cracking sound) in his right knee, reported pain upon range of motion in his right shoulder, and had difficulty with bending and prolonged walking or standing. Dr. Sheikh opined that Plaintiff should not walk or stand for more than two hours or sit for more than four hours in an eight-hour day; could frequently lift less than five pounds, occasionally lift up to ten pounds, and never lift more than ten pounds; should avoid a stressful work environment due to his reported history of PTSD; would likely miss at least three days of work each month, and was not able to work forty hours per week. Dr. Sheikh stated that he expected Plaintiff's condition to improve if he complied with his medication regimen and lost weight. He also acknowledged that Plaintiff might be capable of sedentary work on a part-time basis. Dr. Sheikh did not place any specific limitations on Plaintiff's ability to finger, handle, or grasp. (Tr. 402-405).

Plaintiff returned to Dr. Classen in December 2005 after being found eligible for Medicaid.

(Tr. 428, 538). Dr. Classen performed a lateral release of Plaintiff's right knee on January 20, 2006. (Tr.536). In February 2006, a physician at KCHC submitted a form for the North Carolina Medicaid Pharmacy Program, requesting that Plaintiff be allowed more than six prescriptions per month due to a diagnosis of "End Stage Lung Disease." (Tr. 431). About two months later, Plaintiff reported to Dr. Asha K. Kohli that he slept poorly and lacked money to pay for medication. Dr. Kohli noted that Plaintiff walked with a cane; was alert and oriented to time, place and people; his memory was fair; and his concentration and attention were "very poor" (Tr. 540-542).

During June 2006, Jonathan Venn, Ph.D. conducted a mental status examination. Plaintiff reported that he received treatment at Eastpointe for several months during 2005, after being referred for treatment by a "dumb ass doctor" who stated that he needed counseling. He reported that he bathed and dressed himself, washed and brushed his own hair, watched television, was a member of the International Brotherhood of Electrical Workers, visited friends, held cookouts, and watched car races on television. Dr. Venn noted that Plaintiff was alert and attentive, had an energetic physical activity level and high level of verbal energy, and appropriate (although depressed in range) affect. Plaintiff was diagnosed with alcohol dependence in sustained full remission, moderate recurrent major depressive disorder, PTSD, and an unspecified personality disorder with antisocial features. Dr. Venn observed that Plaintiff "may have exerted sufficient effort on psychological tests, although this is difficult to tell," as "[i]t is not unusual, in conducting disability evaluations to encounter persons who have genuine disabilities like major depressive disorder and personality disorders, [but] nevertheless exaggerate their test results." He concluded that Plaintiff probably had a severe mental illness, most likely a major depressive disorder. (Tr. 572-576).

Dr. Willie C. Floyd performed a consultative examination in July 2006. Plaintiff initially told Dr. Floyd that the primary reason that he was unable to work was due to radiation exposure while working at SRS for six months during 1995 and 1996, but provided a copy of a letter that basically stated that Plaintiff's symptoms were not related to his work at SRS. Plaintiff told Dr. Floyd that the primary reason that he was unable to work was that he could "hardly walk." He reported constant pain in both knees and shoulders (right greater than left) and in his right ankle, as well as in his neck and elbows, and stated that the pain became worse with changes in the weather, walking for more than ninety minutes, squatting or kneeling, lifting more than five pounds, and reaching overhead with his right upper extremity. Plaintiff said he took Mobic (a nonsteroidal anti-inflammatory) for the pain. He also reported that he was diagnosed with COPD in 2004, which was treated with Combivent, Advair, and a nebulizer. Plaintiff stated that he experienced shortness of breath after walking more than one to one-and-a-half blocks, although he noted that "it depends on the heat." Plaintiff did not bring a cane to his examination with Dr. Floyd. Dr. Floyd noted that Plaintiff walked with a mild-to-moderate limp favoring his lower left extremity and could only partially squat. Plaintiff had a normal range of motion, without tenderness, swelling, deformity or instability in all extremities, apart from a limited range of motion in his right shoulder and reported tenderness to palpation of the medial right knee. X-rays revealed a spur on the lateral greater tubercle of Plaintiff's right shoulder, and mild degenerative changes of his right knee, but were otherwise unremarkable. Plaintiff was alert and oriented, with a grossly intact memory, extremely vague thought process, and mildly confrontational behavior. His lungs were clear to auscultation bilaterally without any wheezing or rales noted, although Dr. Floyd observed dyspnea (shortness of breath) during the course of the examination. Dr. Floyd concluded that it was "very questionable" whether the right shoulder

and knee impairments were disabling. His diagnoses included reported osteoarthritis, reported anxiety with history of panic attacks, and reported COPD. (Tr. 577-582).

Plaintiff received treatment at Kershaw County Mental Health Clinic between February and June 2007. Plaintiff consistently walked with a normal gait; had appropriate behavior and logical, sequential, and goal-directed thought processes; and had intact abstraction, concentration, and memory. Plaintiff reportedly did not always take his medications because he did not have the money to pay for them. (Tr. 612-617).

State agency doctors, psychologists and medical consultants evaluated Plaintiff's RFC at several points during the relevant time period. (Tr. 297-304, 313-16, 545-52, 567-69, 600-607, 608-611).

## **TESTIMONY BEFORE THE ALJ**

Plaintiff testified that he stopped working in September 2002 due to difficulty walking. (Tr. 651). He reported he had gout, which caused swelling in his joints when he walked, ran or lifted heavy objects. (Tr. 653). Plaintiff stated that his 2006 knee surgery "made [his knee] worse than it was" and he experienced a burning feeling in his right shoulder. (Tr. 655, 658). Plaintiff rated his pain as a five or a ten (with ten being the worst possible pain). (Tr. 662). He stated that, in addition to taking medication, he treated his pain by lying down and elevating his legs. (Tr. 662). Plaintiff testified that he "sometimes" used a cane, depending on the weather, although it was not prescribed by a doctor. (Tr. 676, 712). With regard to his COPD, Plaintiff testified that, if he did too much or walked too far, he began to wheeze and gasp for breath and experienced a panic attack. (Tr. 656). He further stated that he had trouble breathing in the heat. (Tr. 671). Plaintiff acknowledged that his inhaler helped, although he stated that it took twenty or thirty minutes for the panic feeling to go

away. (Tr. 657). Plaintiff testified that he could not tolerate exposure to dust, fumes and smoke. (Tr. 668). He reported that was seeing a mental health counselor for "[a]ntisocial disorder" and PTSD, and he was taking Paxil, which helped "somewhat." (Tr. 668-69). Plaintiff said he liked to keep to himself and his ability to get along with others "depend[ed] on the person." (Tr. 669).

With regard to his functional abilities, Plaintiff testified that he could sit for two hours at a time, stand for up to forty minutes at a time, and walk one or two blocks. (Tr. 664). At the first administrative hearing, Plaintiff testified that he could stand for ninety minutes at a time. (Tr. 701). He estimated that he could lift up to thirty pounds, but stated that his doctors told him not to lift more than five or ten pounds and that the heaviest thing he lifted on a daily basis was a gallon of milk. (Tr. 665, 700-701). Plaintiff testified that he could not perform a job inspecting or assembling small parts because he did not have patience for "small stuff," did not know how his medication would affect him throughout the day, and would be home sick some days. (Tr. 674-75). Plaintiff testified that he lived in a camper trailer on his cousin's property. (Tr. 649-50). During the first hearing, Plaintiff testified that he woke up at 8:00 a.m., poured a cup of coffee, and walked outside to look at the weather. (Tr. 704). He testified that he ate and took his medication, then sat in the yard, or went inside and watched television. (Tr. 704-705). During the second hearing, he stated that he woke up at about 7:30 a.m., took his medication, and then rested for a couple of hours before eating. (Tr. 663). On a good day, Plaintiff got up and walked in the yard and fed his dog. (Tr. 663). He sometimes prepared his own meals, such as sandwiches or a bowl of grits. (Tr. 705). Plaintiff stated that he dressed himself and went grocery shopping. (Tr. 673). He slept up to three or four times per day, depending on the day. (Tr. 671). On a bad day (which he had four or five days a month), he mostly stayed in bed. (Tr. 664, 705).

## DISCUSSION

Plaintiff asserts that: (1) the ALJ failed to show at step five of the sequential evaluation process that there was other work that Plaintiff could perform; and (2) the ALJ failed to properly assess the treating and evaluating physicians' opinions as required by 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6), SSR 96-2p, and SSR 96-5p. The Commissioner asserts that the ALJ properly evaluated the medical opinions of record (including the opinions of Dr. Sheikh, Dr. Gridley, Dr. Kohli and Mr. Stokes) and properly relied on the VE's testimony in finding that Plaintiff could perform other work which exists in significant numbers in the national economy.

A.    Opinions of Treating Physician and Consultative Sources

Plaintiff asserts that the ALJ erred by failing to consider the opinions of disability from Dr. Gridley, Dr. Kohli, and Mr. Stokes and by disregarding the opinion of one of his treating physician, Dr. Sheikh.  The Commissioner contends that the ALJ properly considered the opinions of the treating physician and the consultative sources.

Plaintiff argues that the ALJ erred because he failed to specify what weight he assigned to Dr. Sheikh's opinion.[1]  He asserts that, in contrast to the ALJ's conclusion, Dr. Sheikh's opinion is supported by Dr. Sheikh's diagnosis of severe osteoarthritis and his notation of severe crepitus. Plaintiff also argues that Dr. Sheikh did not base his opinion on Plaintiff's subjective complaints and that the evidence from other sources cited by the ALJ does not substantially contradict Dr. Sheikh's assessment.  The Commissioner contends that the ALJ did not err in evaluating Dr. Sheikh's opinion

---

[1]As noted above, Dr. Sheikh opined that Plaintiff should not walk or stand for more than two hours or sit for more than four hours in an eight-hour day; he could frequently lift less than five pounds, occasionally lift up to ten pounds, and never lift more than ten pounds; he should avoid a stressful work environment due to his reported history of PTSD; he would miss at least three days of work each month, and he was not able to work forty hours per week.  See Tr. 402-405

14

because the ALJ specifically stated that Dr. Sheikh's opinion was not given controlling or great weight; the ALJ found that Dr. Sheikh's opinion was not supported by his treatment notes and was based on Plaintiff's subjective complaints which were not credible; and the ALJ found that the opinion was not supported by other examining and treating sources including Dr. Fakhri's consultative examination, Dr. Barsanti's treatment notes, Mr. Spence's observation that Plaintiff was "malingering," and Dr. Venn's uncertainty as to whether Plaintiff exerted sufficient effort or exaggerated his test results. See Tr. 28.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p

provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ in this action discounted Dr. Sheikh's opinion, stating that it was inconsistent with Dr. Sheikh's treatment notes. Tr. 28. Review of the ALJ's decision, however, reveals that the ALJ did not specify any inconsistencies and did not discuss Dr. Sheikh's treatment notes (only listing Dr. Sheikh's diagnoses and reciting Dr. Sheikh's RFC opinion). See Tr. 24. The ALJ also discounted Dr. Sheikh's opinion because he believed it was based primarily on Plaintiff's subjective complaints which the ALJ found to be not credible. Dr. Sheikh's assessment, however, indicated that his opinion was supported by "severe degenerative arthritis of the right knee," "severe crepitation of the right knee," and "left eye blindness." In response to the question of whether he felt that Plaintiff's reports of pain were credible, Dr Sheikh circled "yes" and wrote "severe crepitation is supportive of severe arthritis." Tr. 405.

Further, although the ALJ discounted Dr. Sheikh's opinion based on the findings of other sources, there is no indication in the record as to what weight was given to the opinions of Dr. Gridley, Dr. Kohli, and Mr. Stokes. Although the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p" (Tr. 26), he did not discuss these opinions or indicate what weight was given to them. The regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. §§ 404.1527(d) and 416.927(d). Generally, more weight is given to the opinions of examining physicians than non-examining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1527(d)(2)(i) and 416.927(d)(2)(i).

The Commissioner asserts a number of reasons why the ALJ may have rejected these opinions, including that Dr. Gridley's opinion was one reserved for the Commissioner and that Dr. Kohli's opinion was based on a one-time consultative examination and was inconsistent with other evidence of record. While these reasons may be applicable, it is not possible to determine from the ALJ's opinion whether these opinions were considered, what weight was given to them, and/or why they were rejected.

This action should be remanded to the ALJ to determine the weight to be given to Dr. Sheikh's opinion in light of all the evidence. The ALJ should also consider the examining source opinions pursuant to the provisions of 20 CFR 404.1527 and SSR 96-2p and 96-5p and explain the weight given to such opinion evidence.

B.    Hypothetical to the VE

Plaintiff argues that the ALJ failed to satisfy his burden at Step 5 of the sequential evaluation process[2] to show that there was other work that Plaintiff could perform because the hypothetical questions asked of the VE at the hearing did not match the RFC finding ("Finding 5") in the ALJ's decision. (See Tr. 26,[3] 677-685). Specifically, Plaintiff claims that ALJ failed to include in his hypothetical the limitations of: (1) no interaction with the public or co-workers; (2) no repetitive

---

[2]In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

[3]At Finding 5 of his decision, the ALJ wrote that Plaintiff's RFC included restrictions of no repetitive fine dexterity or gripping with the hands; no interaction with the public or co-workers; and an environment free from poor ventilation, dust, fumes, gases, odors, and extremes of humidity and temperature. See Tr. 26.

fine dexterity or gripping with the hands; and (3) an environment free from poor ventilation, dust, fumes, gases, odors, and extremes of humidity and temperature. The Commissioner concedes that the hypothetical questions to the VE did not include all of the language in Finding 5 of the ALJ's decision, but contends that any error is harmless because: (1) the inclusion of these limitations in Finding 5 were the result of clerical, scrivener, or author error; (2) these restrictions are not supported by the record; and (3) any error is harmless as the jobs identified satisfy these limitations.

At the second hearing, the ALJ asked the VE to consider a hypothetical claimant of younger age with a high school equivalency diploma who suffered from chronic skin lesions (due to lichens simplex chronicus), obesity, degenerative joint disease, depression, anxiety, antisocial personality disorder, blindness in one eye, and GERD. The ALJ stated that limitations on the hypothetical claimant (based on the above impairments) included no lifting, carrying, or handling more than ten pounds occasionally or one to two pounds frequently; no standing or walking for more than two hours in an eight-hour day; unskilled work with a specific vocational preparation of 1 or 2; no contact with the general public; a work environment at the lowest end of the stress scale in the world of work; no requirement of binocular vision or depth perception; no constant or repetitive overhead work with the dominant, right upper extremity; no exposure to excessive amounts of dust, fumes, gases, odors, or other atmospheric irritants or pollutants; no work at heights or around hazardous machinery; no climbing or balancing; and no operation of automotive equipment. Tr. 679-681. In response, the ALJ identified the sedentary, unskilled jobs of assembler (Dictionary of Occupational Titles ('DICOT") 734.87-018) and bench hand (DICOT 715.684-026)(Tr. 681-682).

In order for a VE's opinion to be relevant or helpful, it must be based upon a consideration of all the other evidence on the record and must be in response to hypothetical questions which fairly

set out all of the plaintiff's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989). The questions, however, need only reflect those impairments that are supported by the record. <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987). An ALJ may not rely on the answer to a hypothetical question where the hypothetical fails to fit the facts. <u>Swaim v. Califano</u>, 599 F.2d 1309, 1312 (4th Cir. 1979), <u>see also</u> <u>Cornett v. Califano</u>, 590 F.2d 91, 93 (4th Cir. 1978).

The Commissioner contends that the language in Finding 5 that Plaintiff could not perform "repetitive fine dexterity or gripping with the hand" was a clerical error as evidenced by the Commissioner's failure to include in Finding 5 the limitation in overhead reaching with the right extremity which the ALJ discussed in the body of the decision (Tr. 32) and included in his hypothetical to the VE (Tr. 680). Next, the Commissioner argues that the Finding 5 language that Plaintiff needed to work in an environment "free from" atmospheric irritants is a scrivener's error because the ALJ noted elsewhere that Plaintiff's respiratory restriction was minimal. (Tr. 29). Finally, the Commissioner argues that the Finding 5 language that Plaintiff could not interact with co-workers is an author's error because it conflicts with the ALJ's finding in the body of the decision that Plaintiff, due to his mental impairments, needed an unskilled, low-stress job without public contact "as in the hypothetical." (Tr. 29). In support of this, the Commissioner cites <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004)(quoting <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987)("we will not set aside an administrative finding based on an 'arguable deficiency in opinion-writing technique' when it is unlikely it affected the outcome").

This case is distinguishable from <u>Strongson</u> and <u>Benson</u>, however, as the three alleged clerical/scrivener/author errors are not ones that would be unlikely to affect the outcome. It is

possible that these three restrictions could significantly erode the occupation base. The Social Security Regulations provide that:

> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.

SSR 96-9p. Additionally, SSA's Program Operations Manual System provides that the need to avoid only excessive amounts of environmental pollutants that exist to some degree in most work places does not significantly impact the range of work a claimant can perform, but where a claimant can tolerate very little environmental pollutants such as noise or dust, "the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions." POMS DI 25020.015.

The Commissioner also argues that these Finding 5 limitations do not need to be included in the hypothetical because they are not supported by the record. Specifically, the Commissioner argues that the examining physicians and the State agency physicians did not find any restrictions on Plaintiff's ability to handle and finger. Additionally, the Commissioner asserts that Plaintiff did not have such severe environmental restrictions because the ALJ noted that pulmonary function testing indicated Plaintiff had minimal respiratory restrictions and Dr. Floyd noted that Plaintiff had clear lungs without any wheezing or rales (Tr. 29). Here, however, there is also a notation on a North Carolina Medicaid Pharmacy Program form that Plaintiff had "End Stage Lung Disease." Tr. 431. Although the ALJ noted in the body of his decision that Plaintiff's COPD is mild and did not preclude the minimal level of sedentary work, this comment does not address whether there were environmental restrictions due to Plaintiff's respiratory impairment. Tr. 29.

The Commissioner also argues that any failure to include the limitations concerning environmental conditions and interactions with co-workers in the hypothetical to the VE is harmless because the jobs identified meet the environmental and co-worker interaction limitations identified by the ALJ in Finding 5. Although the jobs identified by the VE (bench hand and assembler)[4] provide that taking instructions and helping people is "not significant" and that atmospheric conditions, toxic caustic chemicals, and other environmental conditions "do not exist" (see DICOT 715.684-026, 1991 WL 67344 and DICOT 734.687-018, 1991 WL 679950), VE testimony would be necessary to determine whether these jobs meet the ALJ requirements in Finding 5. Also, the Commissioner has not shown that these jobs fulfilled the limitation in Finding 5 of no "repetitive fine dexterity or gripping with the hands." The job of bench hand requires a high degree of aptitude ability as to finger dexterity as well as "constant" handling and "frequent" fingering, and the job of assembler requires "constant" handling and fingering. See id.

Here, the hypothetical to the VE did not set out all of the Finding 5 limitations and fails to fit these limitations. See Walker v. Bowen, 889 F.2d at 50; Swaim v. Califano, 599 F.2d at 1312. Although it is arguable that the ALJ may have not meant to include these limitations in Finding 5 or that these limitations are not fully supported by the record, the alleged errors are too extensive to recommend affirming the Commissioner's decision on the basis of a scrivener/clerical/author error or a harmless error.

---

[4]The Commissioner, in his brief, erroneously refers to one of the jobs identified by the VE as a buckle inspector rather than an assembler.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence.  This action should be remanded to the Commissioner to evaluate the opinion of treating physician Dr. Sheikh and consider all of the consultative opinions in determining Plaintiff's RFC, and to continue the sequential evaluation process (including, if necessary, obtaining VE testimony).

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be remanded to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

February 12, 2010
Columbia, South Carolina